# JENKINS *v.* OWYHEE DITCH CO.*

### (152 Pac. 1194.)

**Waters and Watercourses—Irrigation—Improvement of Ditches—Necessity.**

1. Evidence *held* to show that improvements in a certain irrigation ditch were necessary so as to create no liability for the alleged lowering of the supply level to land owners.

**Waters and Watercourses—Irrigation—Improvement in Ditches—Damages—Evidence.**

2. Evidence *held* insufficient to show such damage to the plaintiff as to warrant recovery on account of widening and deepening an irrigation ditch.

**Waters and Watercourses—Irrigation—Water Rights.**

3. Although improvements in an irrigation ditch lower the level of the water at plaintiff's land, he cannot *ipso facto* compel the irrigation company to raise the level of the water or install a stop gate, if the improvement generally benefited other users to whose rights plaintiff's rights are in no way superior.

**Waters and Watercourses—Irrigation—Water Rights.**

4. Where stock in an irrigation company is not issued as an appurtenance to the land, the rights of the holders of stock to the use of water are reciprocal, and no stockholder is entitled to greater use of the water than any other.

[As to priority of right to use of water of irrigation company, see note in Ann. Cas. 1913D, 625.]

From Malheur: DALTON BIGGS, Judge.

In Banc.    Statement by MR. JUSTICE HARRIS.

The Owyhee Ditch Company was organized as a private corporation prior to 1895. By supplemental articles of incorporation, adopted in 1895, the capital stock is fixed at $100,000, and is divided into 10,000 shares. The corporation was created for the purpose of appropriating water from the Owyhee River and diverting it through a ditch to be constructed over the following described route:

*On correlative rights of upper and lower proprietors to use water for irrigation, see note in 41 L. R. A. 741.    REPORTER.

"Beginning at a point on the north bank of the Owyhee River, in said county, at a point about three miles south of the south line of township twenty (20), range forty-six (46) east, W. M.; thence in a northerly direction for a distance of about twenty (20) miles; thence to fork, one prong running to Snake River, the main ditch continuing on northerly terminating at Malheur River."

Each share of stock "shall represent, and be entitled to, a water right for two acres, and each share shall represent one vote at any stockholders' meeting," and "each water right represented by each share of stock shall be entitled to its proportionate amount of water flowing through the ditch or canal." Each share of stock may be made liable to an assessment not to exceed 5 per cent per annum, the proceeds of which shall be used for running, operating, and repairing the ditch. The articles of incorporation provide that the company may charge a reasonable rate for the use of the water, but not to exceed $1 per acre per annum, "the proceeds of which shall be used and applied in the payment of any interest that may be due, or become due, and for the purpose of maintaining a sinking fund, for the purpose of paying any mortgage indebtedness which may be incurred, and other indebtedness which may necessarily be incurred, and which cannot be paid out of other funds of the corporation, but, when not necessary for such purpose, no such charge shall be made."

It is further stipulated in the articles of incorporation that:

"No water right shall be procured from this corporation, other than that represented by the stock."

The certificates of stock recite that a person named is the owner of a given number of shares of the capital

stock of the Owyhee Ditch Company, ''subject to assessment for unpaid balance due thereon, not to exceed one dollar per annum, until fully paid up, and thereafter at a rate not to exceed 5 per cent on the par value thereof, for maintenance fund, and the by-laws and articles of incorporation of the company.  Transferable on the books of the company in person or by attorney on the surrender of this certificate.  And the holder is entitled to a water right from said company for [a stated number of] acres of land.''

The corporation appropriated 20,000 inches of water in the Owyhee River, miner's measurement under a 6-inch pressure, and in that manner acquired its water right.  The company completed its ditch, now commonly known as the Owyhee Ditch, in 1895, and since that time has been distributing water to its stockholders along the route of the canal.  The ditch is about 21 miles in length.  It was originally constructed with a grade of 16 inches to the mile, except through the hogback where the grade is 19 or 20 inches to the mile for a distance of 2,600 feet.  From the intake to the hogback, a distance of 6 or 7 miles, the canal was about 20 feet wide, and from that point on it was narrowed so that at the Jenkins ranch, a distance of 4 or 5 miles below the hogback, the ditch was from 12 to 14 feet wide, and at the mouth it was only about 6 feet on the bottom.  The plaintiff owns 200 acres of land through which the ditch runs, in a northerly direction, so as to leave 60 acres on the west and 140 acres on the east side.  The land lying west of the ditch is higher, while the land on the east is for the most part below the canal.

This litigation revolves around two tracts of land, aggregating about 22 acres, which are a part of the 140 acres east of the canal; one piece, known as the

alfalfa field, embraces about 8 acres, and the other, referred to as the wheat field, includes about 14 acres. A house stands not far from the southwest corner of the 140 acres east of the canal, and the alfalfa field is located north of the house, while the wheat field is south of it.

At the annual meeting held on September 6, 1910, the stockholders unanimously adopted a resolution reading thus:

"Resolved that it is the sense of this meeting of the stockholders of the Owyhee Ditch Company that the newly elected board of directors immediately take such steps as may be necessary or advisable to put the Owyhee Ditch in the best possible condition to meet the needs and requirements of all the stockholders of the O. D. Co., and that they put in distributing weirs the same as are used by the United States government."

The plaintiff owned 309½ shares of stock which were voted for the improvement by John Ray as proxy. After the passage of the resolution the board of directors caused the ditch to be cleaned and widened, at an expense of about $29,000, so that when the work was finished in 1911 the canal was 20 feet wide, except through the hogback, from the intake to a point known as the Emison wasteway, and located about 2 miles below the Jenkins ranch. The ditch was not enlarged below the Emison wasteway.

After the completion of the improvement W. G. Jenkins asked the board of directors for permission to put in a stop-gate in the ditch at his ranch so that he could raise the water level, claiming that the enlargement of the canal had lowered the surface of the water so that he could not irrigate the alfalfa and wheat fields. The ditch authorities refused to permit

the installation of a stop-gate, because of the prohibition contained in a by-law, which provides that:

"No dam, stop-gate, wheel or other obstruction shall be allowed in the Owyhee Ditch."

The plaintiff afterward commenced this suit by filing his complaint on May 3, 1912. The court found:

That "the water was not lowered at the premises of plaintiff, and that the same land can now be irrigated from said ditch upon plaintiff's said land as could be irrigated prior to the doing of the work complained of."

The decree was favorable to the company, and the plaintiff appealed.    AFFIRMED.

For appellant there was a brief with oral arguments by *Messrs. McCulloch & Wood.*

For respondent there was a brief over the names of *Mr. William H. Brooke, Mr. John L. Rand* and *Mr. Ralph W. Swagler,* with oral arguments by *Mr. Brooke* and *Mr. Rand.*

MR. JUSTICE HARRIS delivered the opinion of the court.

1, 2. If the plaintiff can now water the same land that could be irrigated before the enlargement of the ditch, and if his opportunities for using the water have not been lessened or impaired, then Jenkins cannot complain, even though it be assumed that the amount of land which he irrigated and the extent to which it could be irrigated before the widening of the ditch determine and measure the absolute legal right which he now possesses. The improvement which the plaintiff complains of was necessary and in the interest of the stockholders generally. Willows had been per-

mitted to grow along the ditch. The banks had caved off. Sediment and sand had accumulated, and the canal was in poor condition. Breaks occurred frequently. Stockholders living below Jenkins were constantly complaining because of the lack of water; and one witness testified that he had seen the Owyhee Ditch utterly dry four miles below the Jenkins property when the upper users were drawing heavily on the supply. The canal had been cleaned down to the grade line upon which it was originally constructed, but the ditch had not been deepened below that line. From the intake to the outlet the supply of water is now sufficient for all the stockholders. Peter Tensen a witness for plaintiff, says that there was a good deal of trouble getting water through the ditch before 1911; that the obstructions in the canal tended to impede the flow of water, to dam it up, and "make it stand higher than it does now"; but that "it is an excellent ditch now."

After the ditch was cleaned and widened the water level was lower than before 1911. It may fairly be inferred from all the testimony that the accumulated obstructions in the ditch interfered with the flow of the water and tended to raise it; and it also appears from the evidence that the water level was lowered as a result of widening and cleaning the ditch, notwithstanding the fact that the flow was increased about 50 per cent. Estimates of the extent to which the water was lowered range from 6 to 16 inches. Witnesses for the plaintiff testified that the water level has gradually raised above the stage maintained in 1911.

Water for the alfalfa and wheat fields has been taken from the ditch through a tap near the point where the canal enters the premises of plaintiff, and it is then

carried through a lateral dug in the ground to the two tracts. The alfalfa field had been cultivated for five or six years prior to 1911, while a part, but not all, of the wheat field had been cropped since 1908. There is much conflicting evidence relative to the irrigation of the land and the ease or difficulty with which it could be watered; but a careful examination of the entire record will furnish ample support for the conclusion that all of the alfalfa land and all of the wheat field could not be irrigated at any and all times prior to 1911, and that it was necessary to take advantage of the occasions when the water would be at a high stage in the ditch in order to irrigate the two tracts. Fred Klingback, who was ditch rider in the years 1906, 1907, 1909 and 1910, when speaking of the alfalfa field, testified that:

Jenkins "irrigated it every year when he would catch the water high enough to irrigate. Sometimes the crop would dry pretty near completely out. * * Every year he had trouble in getting water on that alfalfa field," and that "every year there would be part of it dried out."

On June 21, 1913, levels were run by competent civil engineers, and they ascertained that approximately only about one half of an acre was at that time above the surface of the water in the ditch; that about five acres were lower, but not to exceed nine inches lower, than the water level in the canal; and that the remainder of the land is more than nine inches lower than the water level in the ditch. Peter Tensen, when a witness for plaintiff, stated that:

"Mr. Jenkins could irrigate the same land to-day that he could prior to 1911, but he couldn't irrigate it in 1911, on account of the water at that time being lower."

The plaintiff contends that he was not able to use the water in 1911, although it is admitted that the tenant on the premises failed to irrigate when the superintendent told him that the water in the ditch was high enough for that purpose, and he did not attempt to irrigate until the water had lowered with the fall in the Owyhee River. In July, 1912, when the water was about 17 inches below the high-water mark appearing on the bank, levels were run on the alfalfa and wheat fields by engineers who discovered that even at that stage of the water, when the average level was higher than in 1911, though not so high as in 1913, all but three or four acres could be irrigated by flooding; and the evidence clearly shows that the three or four acres mentioned could be watered by a series of parallel ditches. The case of *Miller* v. *Imperial Water Co.,* 156 Cal. 27 (103 Pac. 227, 24 L. R. A. (N. S.) 372), cited and relied upon by plaintiff, is not analogous to this suit, because here no attempt is being made to deprive Jenkins of his rightful share of the water; but he can still use the water furnished by the ditch, and he can still irrigate as much land as he could prior to 1911, although he may be obliged to resort to corrugation instead of flooding for a small portion of his land.

3. Assuming even that Jenkins will be obliged to run a new lateral for the alfalfa field, and likewise conceding that it may be necessary to corrugate a small portion of the wheat field, nevertheless the plaintiff does not, under the circumstances presented here, have the absolute right to compel the defendant to raise the level of the water in the ditch and maintain it where it was before. The conditions now existing resulted from a necessary improvement which was made in the interest of all the stockholders and the installation of

a stop-gate would interfere with the flow of the water and tend to thwart the very purpose which the improvement was designed to accomplish. The rights of plaintiff are no greater than the rights of lower users. No one share of stock can be favored at the expense of another share of stock; and, moreover, all the stock owned by Jenkins was voted for the improvement of the ditch. The enlargement of the canal has been the means of supplying water to those who could not obtain it prior to 1911, although they were just as much entitled to receive water as was the plaintiff.

4. It must be remembered, too, that the shares of stock were not dedicated to any described land; that the stock held by Jenkins was not issued to him as an appurtenance to his land; and that, therefore, the rights and obligations of the stockholders, when considered in relation to their use of the water, are peculiarly reciprocal.

The evidence justifies the conclusion arrived at by the Circuit Court, and the decree is affirmed.

AFFIRMED.